investments. Good morning, Your Honors. Good morning. Philip Arnot appearing for Mr. Alfs, the appellate in this case. I see my time has started. So I guess I should address the issue that has been raised by the court, and that is whether or not this is an appeal on an interlocutory matter as opposed to a final judgment. And I think in my brief I've distinguished the cases from our present case. For example, in the one case that the court cited, it was an appeal on a denial of confirmation of a Chapter 11 plan. That truly is interlocutory. Our case is one where a monetary judgment was entered against my client, one that could be executed on had an appeal not been taken. Mr. Alfs had no choice but to file this appeal and protect himself by getting a stay, obtaining a bond pending the appeal. The cases that we've read and that you have cited and I've looked at carefully clearly indicate that if the main issue is not the one, if the main issue has been decided and that the issue that may be interlocutory is not the main issue, then it can be considered to be a final judgment of the court. Is there any factual relationship between the accounts receivable issue, the inventory and log issue, and Claim 3, which at least I understood to be a combination of the two? Well, my argument has been at the outset and continues to be that, no, there is no relationship. What happened was that Mr. Alfs, in September of 1997, started dealing with straight-line investments. The Bankruptcy Appellate Panel got confused between North Coast Hardwoods, its predecessor, and straight-line investments when it talked about the sale of accounts receivable. Prior to the November order of the Bankruptcy Court authorizing Mr. Alfs to loan up to $100,000 on inventory and equipment, Mr. Alfs had already been purchasing accounts receivable from straight-line investments, the debtor, and straight-line had sold accounts receivable to other parties, not just Mr. Alfs. These were outright sales. They were not loans or advances as some of the clerks that were working in the offices termed them. And I think I can't help but just repeat what happened at the trial court level. When we talked about factoring, and factoring is a sale, it's not a loan, it's not an advance, counsel for the trustee said that normally a factoring agreement has an agreement to repurchase the accounts if not paid within 90 days. That is excerpt number 9 at page 8 at the bottom. And Judge Jaroslawski says, yeah, I know all of that. This is clear error on the law as to what factoring really is. A factor is a person who buys accounts assumes the risk of loss. If the account doesn't pay, as it occurred in this case, the purchaser suffers the loss. In Mr. Alfs' case, he suffered a loss of over $20,000. He paid $186,000 for $200,000 worth of accounts, but the account debtors only paid $163,000. So he lost money on the deal. He had no recourse back against straight-line investments. Every witness, every single witness at trial, including the trustee's own witness, Ms. Giddings from Six Rivers Bank, testified that factoring is an outright purchase of accounts and the risk of loss goes with the purchaser. Now, that is the law, and I've cited the civil court sections in my brief. Judge Jaroslawski didn't understand that was the law, so that's why I believe that this court can review this matter de novo. And I think it's a legal issue. It's not a factual issue. What's the status of the inventory claim that the BAP sent back to the bankers? Well, the inventory claim, I mean, I can tell you what I think the trial judge did. He ignored it because he didn't see that there was anything to recover there, because Mr. Alfs had been authorized to loan up to $100,000. His testimony was he got back $101,000. And so there was, with interest, there was he recovered only what he had loaned. That sounds like a comment on the merits. I just wanted to know what the procedural status was as of the moment of that portion that was remanded back to bankruptcy court. Well, this appeal was taken and the matter has not gone back. So that's still pending. That's correct. That's correct. But as I said earlier, on that issue, if the judgment of the bankruptcy court was interlocutory, it was interlocutory from day one. And I don't think it was because Mr. Alfs had no choice but to take an appeal from a monetary judgment. The judge did not rule on the other cause of action. There's no question about that. But I think he ignored it because there was no recovery to be had by the trustee. So what I'm looking at is that the cases that this circuit has decided on, those interlocutory appeals, I think are distinguishable from our present case. It was not the main issue that was remanded. And so I think that we can look at it from the standpoint that we have a final judgment that Mr. Alfs had to take, from which he had to take an appeal. As I said earlier, the testimony of all the parties acknowledged that factoring is a normal course of business where the business is either new or in financial straits. Straight line investment was the successor in interest to a company that had gone bankrupt called North Coast Hardwoods. And North Coast Hardwoods had filed a Chapter 7. Six Rivers Bank had urged Straight Line Investments, who owned the real estate where the North Coast Hardwoods had operated, to take over the operation, and it did. It had no immediate cash, so it began to sell its accounts receivable. When it had to meet a payroll, pay payroll taxes, it would go out and sell an account. Now, it didn't sell all of its accounts, it just sold a few of them. And as you can see, it had millions of dollars of accounts receivable, but Mr. Alfs only bought $200,000 of those. Some paid quickly, some didn't. But when Mr. Galt for Straight Line Investments needed cash, and he needed it now, he would call Mr. Alfs and say, I'm prepared to sell you these accounts. If you can buy them, I'll sell them to you. And he'd give them a discount of anywhere from 5 to 10 percent, which was normal within the trade. Mr. Beckman, who was over 20 years with Crocker Bank, testified that that was normal in the factoring business. So he would buy the accounts. The account debtor would then either pay Mr. Alfs directly or the money would come to Straight Line, which would then be passed on to Mr. Alfs. Now, the issues that I think that are important, besides the fact that the debtor had no interest in the accounts once they were sold, are that there was no depletion of Straight Line's estate. They got dollar for dollar. In fact, had they not sold these accounts, they would have lost the $20,000 that Mr. Alfs had lost because those people did not pay. Mr. Alfs suffered the risk of loss, and that's what happens in a factoring situation. So the transaction was a sale of accounts. When the money came in, it was no longer property of the estate. And even if it had been, I think the defenses that we raised at the lower court of recoupment and set-off and earmarking all apply, that these funds were definitely earmarked for Mr. Alfs because he was the factor, the purchaser of these accounts. Again, as I said, the remand issue, I think, is distinguishable. I don't think that we have that situation. The main issue that was before the bankruptcy court was the issue on accounts receivable. And I think that the bankruptcy court misinterpreted the law when it said that a factoring arrangement requires a repurchase within 90 days. That's not what a factoring arrangement is all about. Evelyn Giddings, Steve Beckman, Matt Gault, Dan Alfs all testified. There's no testimony to the contrary that when you sell an account receivable, you factor it. The person buying that account assumes the risk of loss, but you get the benefit of that money. So as Judge Marler said at the bankruptcy appellate panel in his dissent is that, I mean, if you penalize Mr. Alfs for making this deal with Straight Line, Straight Line is going to get a windfall. They got the $168,000, excuse me, $186,000 from Mr. Alfs, and now a judgment's been rendered against him for $160,000. That's double penalty. The estate gets the money in advance for the sale of the accounts, and Mr. Alfs gets penalized, and the estate gets that same money again. So I'll reserve a few moments for rebuttal. Surely. Mr. Chandler. May it please the Court, David Chandler, appearing for Charles Sims, trustee, the appellant. I think that before I take the opportunity that Mr. Arnot took concerning the interlocutory nature of the judgment, the following the remand by the bankruptcy appellate panel, we attempted to have the matter heard before the bankruptcy court. The bankruptcy court declined based on the appellant's filing the notice of appeal to this court. The bankruptcy court apparently felt the notice of appeal deprived it of jurisdiction. Yes. That was my understanding. Does the trustee intend to pursue that claim? I don't know, Your Honor. It's a difficult claim, factually. There is some evidence in the record. If Your Honor reviewed the record, there is some testimony about that. Basically, Mr. Alfs received $168,000 worth of lumber inventory, and there was only a $100,000 authorization to obtain credit under Section 364. I can't say at this time. I did ask the trustee last week if he would authorize me to dismiss the claim, and he declined to do so. Whether that means he wants me to pursue it on remand or not, I don't know. However, I think, I hate to agree with Mr. Arnot, but on one point, I do. It's okay if you do. Well, there are some who would dispute the possibility that that could ever happen. The defenses that the appellant raises, we think, for the first time on appeal, would be equally applicable to the lumber transaction, because the money was advanced by Mr. Alfs under what they call the custom milling agreement. It was not, in fact, a custom milling agreement. It was an agreement to loan money. And whether that was the $100,000 that was authorized or not, I believe it was. I believe that's their position. But there was actually $168,000 that was loaned, and there was inventory taken in excess of the $100,000. If, if, big if, we were to decline jurisdiction on the basis that the pending matters, the inventory matter, and the matter would go back to bankruptcy court, back to Judge Jaroslawski? Jaroslawski, yes, Your Honor. Correct? Yes. And the trustee would then be in a position to make a determination which, whether it wished to pursue the inventory claim. Yes. If it dismissed the inventory claim, schools out. Probably correct. Is the judgment on the accounts receivable claim enforceable as we speak? But for the stay pending appeal, yes. When was that obtained? Immediately. Immediately. It was obtained in the bankruptcy trial court? Yes, it was, Your Honor. And it's remained in effect? Yes, Your Honor. Is there a bond? There is a bond. There's a cash bond posted. It was done by stipulation. Another one of those agreements between Mr. Arnot and myself. The court asked if there was a factual relationship between the inventory and the accounts receivable, and there may well be in terms of this custom milling agreement, which was really an agreement to loan money, and the guarantee that Mr. Alves testified was all-encompassing. The trustee's legal obligation is to pursue any and all assets, potential claims, et cetera, to benefit the estate as much as possible, right? Absolutely. So there are some legal constraints on the ability of the trustee to simply forego the inventory claims? There is, Your Honor. The ñ I think what the appellant has forgotten in his argument is that under a 540 ñ under a 549 avoidance action, there are only three things that have to be proven by the trustee. There's property of the estate, that it was transferred after the commencement of the case, and it was not authorized by the court or by the court. Those three things. You don't have to prove depletion. Depletion is not an element of 549. Let me go back to one follow-up question on this jurisdictional issue. If, again, if, we were to say we didn't have jurisdiction, send it back, it goes back all the way to bankruptcy, trial court, does that act deprive Alves of an opportunity to obtain review as to the merits of the accounts receivable claim? I don't know. That's a very good question. What happens to it? I mean, if it goes back and there's a trial on the remaining two claims, then is there another appeal to BAP? Or what would happen if the appeal were instead taken to the district court? That's a concern that we have. That's a very big concern, because the appellant would obviously try to do that. He would opt out of the BAP and argue the same issue before the district court. The BAP doesn't bind the district court. No. So that creates another wrinkle. Yes, it does. That's something we're very concerned about. The any more question on that? I have thought through that issue a number of times. And I frankly, I think what would happen is the decision of the BAP on the issues that the BAP decided on would become the law of the case, I would assume. And since it's already gone up and back, I'm not sure it can go up again. Okay. Ms. Chan, let me ask you a slightly different question. If we were to say we didn't have jurisdiction, when you get back to the bankruptcy court, what is the what would be the effect, the preclusive effect of the BAP's decision on the trial of the inventory and log claims and the remaining claim 3? If any. Your Honor, we would argue that at the trial court, we would then argue that the depletion argument made by the appellant is no longer. The BAP decision is binding on that issue. That's what we would argue. And the depletion issue is common to both claim 1 and 2? Well, it would be, Your Honor, because there's no question from Mr. Al's testimony that he advanced $168,000 to purchase lumber. And then he took lumber of a value of $124,000 plus some cash. So the same reasoning would apply to this depletion. In other words, he would argue that it didn't deplete the estate because the estate received the money. However, under 549, that is not an element. And once the trustee establishes the three elements, then we jump to section 550 of the code to determine whether or not we can recover money and how much. And 550A applies because Mr. Al's is the initial transferee, and that section provides that the court may award the value of the transfer or recovery of the property. And the court did both. It ordered that the receivables that weren't collected come back to the estate and that the money that was collected come back to the estate. I don't think that the appellant has argued except on appeal that Mr. Al's is a good-faith transferee, but I think we have to jump back to the bankruptcy court's finding that Mr. Al's and Mr. Gault were involved in a conspiracy to circumvent the order entered by the bankruptcy court authorizing this $100,000 loan. And that's a factual determination made from the testimony by the trial judge. Now, I think that the reason is set forth the reason that one of the reasons that there was a dispute over this borrowing order is set forth in the reply brief of appellant at page 3, where it says, because there were already competing claims to the accounts receivable, the court granted the motion but denied the debtor's request to utilize accounts receivable as part of a collateral. And even the appellant acknowledges that there were competing claims as to these accounts receivables, and that was a part of the reason, I submit, that the bankruptcy court did not authorize the borrowing secured by account receivable. Now, Mr. Arnot makes a – his argument based upon whether this is a sale or this is a borrowing, whether it's a 363 applies or a 364 applies. To the extent that it was a sale, 363C provides that if the debtor is authorized to operate the business, and unless the court orders otherwise, the trustee, debtor in this case, may enter into transactions including the sale or lease of property or the estate in the ordinary course of business. The court ordered otherwise, number one. Number two, it's not in the ordinary course of business to do this. We look to this Court's decision in the Danton-Russell case, which provides the vertical and the horizontal test, and that this appellant met neither test, because the appellant had tried through debtor's counsel, who happens to be appellant's counsel, to get an order of the court allowing a transfer of these accounts receivable. Unable to do so. He was unable to do so. So they came up with this scheme under the guise of a custom milling agreement that was in the form, but in substance, it was an agreement to loan money to the debtor and to have an option to purchase these lots. Now, the bankruptcy court found that what this constituted was a conspiracy to circumvent the court's borrowing order under 364. And I submit that the bankruptcy court did exactly the right thing in applying the elements of 549 and granting judgment based on section 550A. Now, the appellant argues recoupment, earmarking, and I guess set-off, the problem with the equitable remedies is the inequitable conduct that the court found. I don't think that – I think that either the recoupment or the earmarking, I believe, are both equitable powers of the court. And earmarking can't apply, because the assets for earmarking can't ever come in the control of the debtor. Once they're in control of the debtor, then earmarking doesn't apply. Earmarking is if the bank's going to make a loan to the debtor for the purpose of paying a third-party vendor, then they – that's the agreement and the money goes directly to the third-party vendor. That would be an earmarking-type argument. Recoupment is not applicable because there's no countervailing claim. There was a guarantee on this obligation entered into by Matt Gault that was never disclosed to the court, by the way, but it – the guarantee was actually secured, and there was payment on that guarantee. So Mr. Allis can't claim recoupment. The set-off doesn't work because these claims are of different priority. If you make a loan to the debtor in contravention of Section 364, or transfer money to the debtor in – under Section 363, but it's not authorized, what you have is a claim to get the money back that's on equal priority with general unsecured creditors. It's not an administrative priority-type claim. So I think that Mr. Allis has a claim, but his claim for the money is not a postpetition claim. It's not treated with the same priority as a postpetition claim. It's treated as a prepetition claim, as a general unsecured claim. And the – I thought that Judge Klein gave a very interesting example in his concurring opinion of the history in Great Britain of the – their bankruptcy scheme, and that – the conclusion from that example is that sometimes the bankruptcy law can be very harsh, particularly when one does not act in good faith, as Mr. Allis did here. So I submit, Your Honor, that the – that the judgment of the bankruptcy court should stand and that the matter should be remanded for trial on the remaining issue. Thank you. Thank you. Mr. Arnott. Thank you, Your Honors. Well, I guess – I've got eight minutes. The dispute really arises out of whether or not the accounts receivable – the money that was paid by the debtors vendors was property of the estate. And our position all along has been, because of the factoring arrangement, that once the account receivable was sold, it was no longer property of the estate. Now, whether or not the debtor had the right to do that is a question that the trustee has raised from day one. The debtor has the right to act in the ordinary course of business under Section 363 of the Bankruptcy Code. And every single witness, including the trustee's own witness, testified that or in businesses that were having financial problems. Every single witness. There wasn't one witness that said that that was not customary and ordinary in this type of transaction, this type of business. Evelyn Giddings, the bank's – Mr. Chandler was representing Six Rivers Bank at the time. She testified that, yes, we factor accounts all the time. And Mr. Alves was in the business of buying accounts. He had purchased from Mr. Sims, the appellee in this case, in another transaction about a year or so earlier, several hundred thousand dollars of notes at a discount. So Mr. Alves was in the business of purchasing accounts. He had testified earlier that he had purchased in excess of $500 million in the previous years in business with other parties. He purchased accounts from the FDIC. He purchased accounts from all over the country, PG&E, so on. So it was ordinary to the debtor because that's what the witnesses said. Mr. Beckman, as an officer, manager for Wells Fargo Bank and then Crocker, said factoring is a method that we use all the time. Banks don't use it anymore because they rather loan on the accounts and let the debtor have the accounts to utilize. But here, Mr. Alves paid good, hard money, and the debtor got the benefit of that money. Once the account was sold and the transaction concluded, it was no longer property of the debtor's estate. As Judge Marler said, the bankruptcy code, this is it from the BAP, the bankruptcy code needs to be interpreted using the plain language doctrine. And the estate, he said, was possibly deprived of $14,000. And he arrived at that because there had been no concrete evidence in his mind that Mr. Alves only got back $160,000. But we know that's the case. So he thinks that because Mr. Alves got $200,000 worth of accounts and he only paid $186,000 for them, that maybe he should pay the other $14,000 to the estate. Well, he only got back $160,000, and so he bore that loss as any factor would. So it's a windfall to the trustee and to the estate if Mr. Alves is required to pay $160,000. Now, there's a lot of evidence that he received on the purchase of these accounts receivable. It just ‑‑ and I want to go back quickly on this issue of remand. Mr. Alves did put up a bond, got a stay of execution, as Mr. Chandler has pointed out. And I cited a case in Ray Saxman in my brief regarding this issue. And it seems to me that judicial efficiency requires this court to hear this matter and make a decision. To send it back to the bankruptcy court or to deny you have jurisdiction would cause a hardship not on everyone. Mr. Alves would have to start all over again, get a new bond, take the appeal through the process, and then maybe we would be back here in about three years. And that is not judicial efficiency. And I think that this court should make a decision on the real issue, which is whether or not Mr. Alves is required to pay back money on the accounts receivable that were sold to him. And I cited cases in my briefs that clearly indicate that once an account is sold, it's no longer property of the estate. Therefore, they cannot use that issue under 549 that the transfer was property of the estate. And all of the issues of defenses that we raised at the BAP are appropriate here as well. Recoupment, earmarking, and set‑off. And I think that, as Judge Marler aptly pointed out, this would be a tragedy if this judgment were to stand. Thank you so much. Thank you, counsel, both of you. The matter just argued will be submitted and the court will stand adjourned.
judges: Rymer, Hawkins, Bybee